## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WALTER B. FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, *et al.*,<br><br>Defendants. | Civil Action No. 12-1094 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Walter Freeman, purchased an interest in approximately 5,000 acres of Federal land located in southern Oregon from a mining and exploration firm. The price was $10. *See United States v. Freeman*, OR-48970A (March 27, 2009) ("ALJ Decision") at 12–13; AR 1926–27. Prior to the sale, Inspiration Development Corporation ("IDC"), conducted extensive research regarding the land and explored the viability of potential mining operations. At the conclusion of its exploration, rather than attempt to develop the land, IDC was prepared to abandon the claim altogether. *Id.* Instead, IDC sold its interest to the plaintiff. *Id.* Thereafter, the plaintiff unsuccessfully attempted to market the nickel ore to a nearby smelter, the only nickel smelter in the United States. The smelter "concluded that [the plaintiff's] ore did not have a high enough nickel content to be worthy of processing" and instead decided to import ore from Australia. *Id.* Undeterred, the plaintiff attempted to develop his own mining operation on the land, but the Bureau of Land Management ("BLM") denied the plaintiff's proposal and a congressional moratorium prevented the plaintiff from patenting his claim on the land. Accordingly, in 2001, the plaintiff filed suit in the Court of Federal Claims seeking compensation for the alleged taking of his rights in the land, which the plaintiff claims "would

have made in excess of $146 million."  Pl.'s Mot. Partial Summ. J. & Mem. Supp. ("Pl.'s Mem.") at 4, ECF No. 25.

The Court of Federal Claims stayed the plaintiff's action to permit the United States Department of Interior ("DOI") to determine whether the plaintiff had established the discovery of a valuable mineral deposit on the land and, thus, whether the plaintiff maintained a valid property interest in the Federal land as of the time of the alleged taking.  After a lengthy mineral examination, an Administrative Law Judge ("ALJ") for the DOI ruled in a detailed 88-page opinion that the plaintiff had "failed to establish . . . a discovery of a valuable mineral deposit." ALJ Decision at 88; AR 2002.  The ALJ's decision was affirmed in a thorough 48-page opinion by the Interior Board of Land Appeals ("IBLA").  *See United States v. Freeman*, 179 IBLA 341 (2010) ("2010 IBLA Decision"); AR 05805.[1]

The plaintiff now brings this action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2), against the DOI and two of its components, the IBLA and the BLM (collectively, the "Federal Defendants"), seeking to set aside two decisions of the IBLA relating to the plaintiff's mining rights, on the grounds that the decisions were arbitrary, capricious, and lacked substantial evidence.  *See* Compl. at 19 ("Prayer for Relief"), ECF No. 1.  Pending before the Court is the plaintiff's Motion for Partial Summary Judgment on his second cause of action, challenging the 2010 IBLA Decision, which upheld the ALJ's determination that the plaintiff failed to make a discovery of a valuable mineral deposit as of the dates of the alleged

---

[1] The 2010 IBLA Decision is contained in the Administrative Record ("AR") for this action, at pages AR 5805–53. Since the voluminous AR, which contains 15,274 pages of documents, is on a CD provided to the Court and has not been filed on the docket for this case, *see* Notice Regarding AR at 1, ECF No. 14, citations to the 2010 IBLA Decision will be to both the publicly available IBLA Digest of decisions and the AR.

government taking.[2]  *See generally* Pl.'s Mem.[3]  Also pending before the Court is the Federal

Defendants' Cross-Motion for Summary Judgment, ECF No. 27.  For the reasons explained

below, the plaintiff's motion is denied, the Federal Defendants' motion is granted, and the 2010

IBLA Decision stands.

## I.     BACKGROUND

The background of this case, and the applicable law, has been summarized in great detail

by the Court previously in *Freeman v. United States Department of the Interior*, 37 F. Supp. 3d

313 (D.D.C. 2014), which addressed the plaintiff's first cause of action.  Accordingly, the

relevant background is summarized only briefly below.

### A.     Statutory and Regulatory Framework

Under the General Mining Law of 1872 (Mining Law), 30 U.S.C. §§ 22 *et seq.*, "citizens

may stake, or 'locate,' claims to extract minerals [on federal public land] without prior

government permission and without paying royalties to the United States."  *See Orion Reserves*

*Ltd. Partnership v. Salazar*, 553 F.3d 697, 699 (D.C. Cir. 2009).  Before a Congressional

moratorium was enacted in 1994, claimants could "apply for purchase of a deed, or 'patent,'

conveying full legal title to the land on which their claims are located."  *Id.* at 699 (citing 30

---

[2] The plaintiff alleges two causes of action in the present suit.  The plaintiff's first cause of action challenged the jurisdiction of the DOI's Office of Hearing and Appeals ("OHA") to determine the validity of the plaintiff's mining claims at certain historical dates when the claims were allegedly the subject of a government taking.  In a prior Opinion, this Court upheld the OHA's jurisdiction and denied the plaintiff's motion for partial summary judgment.  *See Freeman v. United States Dep't of the Interior*, 37 F. Supp. 3d 313 (D.D.C. 2014).  This Opinion addresses the plaintiff's sole remaining cause of action, which challenges the 2010 IBLA Decision finding that the plaintiff failed to make a discovery of a valuable mineral deposit as of the dates of the alleged taking.  At the request of the parties, briefing on the two issues was bifurcated with the jurisdictional issue preceding the merits issue.  *See* Minute Order (November 27, 2012).

[3] The plaintiff has requested oral argument on the pending motion, Pl.'s Mem. at 5, but given the sufficiency of the parties' written submissions to resolve the pending motions, this request is denied.  *See* U.S. Dist. Ct. Rules, D.D.C., Local Civil Rule 7(f) (allowance of oral hearing is "within the discretion of the court").

U.S.C. § 29).  To qualify for a patent, an applicant must establish that their mining claim is valid.[4]

An unpatented mining claim is valid against the United States only upon discovery of a valuable mineral deposit within the limits of the claim, and compliance with all statutory and regulatory requirements relating to the location, recordation, and filing of the claim.  *See* 30 U.S.C. §§ 22, 26, 28, 28e; *see also Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963) (unpatented mining claims are "valid against the United States if there has been a discovery of mineral within the limits of the claim, if the lands are still mineral, and if other statutory requirements have been met").  As the Supreme Court explained almost a century ago, "no right arises from an invalid claim of any kind . . . otherwise they work an unlawful private appropriation in derogation of the rights of the public." *Cameron v. United States*, 252 U.S. 450, 460 (1920).  Thus, although a claimant may explore for mineral deposits before perfecting a mining claim, without a discovery, the claimant has no right to the property against the United States or an intervenor.  30 U.S.C. § 23 (mining claim perfected when there is a "discovery of the vein or lode").

To determine whether a mining claim is valid, BLM conducts a mineral examination.[5]  If the examination indicates the lack of discovery of a valuable mineral deposit or that the applicant failed to meet other administrative requirements under the Mining Law, the BLM may initiate an administrative mining contest proceeding to challenge the validity of the claim, since either of

---

[4] The D.C. Circuit has noted, however, that "[e]ven without a patent, claimants can maintain their mining rights indefinitely so long as they comply with federal, state, and local requirements" for a valid claim. *Orion Reserves*, 553 F.3d at 699 (citing 30 U.S.C. §§ 26, 28).  These possessory interests are "unpatented" claims and give the owner equitable title, as opposed to "patented" claims, in which a private owner has been bestowed full legal title.
[5] BLM is a subagency within DOI tasked with administering mining claims on federal public land. *See generally* 43 C.F.R. § 3809; *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 307–08 (D.C.Cir.1987) (BLM is "the subagency of the Department charged with land management responsibilities, with permanent, comprehensive guidelines for carrying out its mandate").

those examination results, if substantiated, may render the mining claimant ineligible for a patent.[6]

The OHA provides two levels of review to resolve mining contests: ALJs in the Hearing Division have authority to hold evidentiary hearings and issue decisions concerning the validity of mining claims; and the IBLA decides appeals from ALJ rulings. 43 C.F.R. §§ 4.452–4–8; 43 C.F.R. § 4.452–9.  In contest proceedings before the ALJ, the BLM bears the initial "burden of going forward with sufficient evidence to establish a *prima facie* case" that the claim is invalid. *Foster v. Seaton*, 271 F.2d 836, 838 (D.C. Cir. 1959).  "The government presents a *prima facie* case where a governmental mineral examiner offers expert testimony, based on probative evidence that the discovery of a valuable mineral deposit has not been made within the boundaries of a contested claim." *Ernest K. Lehmann & Assocs. of Mont., Inc. v. Salazar*, 602 F. Supp. 2d 146, 150 (D.D.C. 2009), *aff'd*, 377 Fed. App'x. 28 (D.C. Cir. 2010) (citing *United States v. Pass Minerals, Inc.*, 168 IBLA 115, 123 (IBLA 2006)).  Once the government has made a *prima facie* case, the burden shifts to the claimant to establish by a preponderance of the evidence sufficient proof of validity. *Id.*  The claimant bears the ultimate burden of persuasion and must produce evidence to rebut the government's case and establish the validity of the mining claim. *Lara v. Sec'y of Interior*, 820 F.2d 1535, 1542 (9th Cir. 1987); *see also Ernest K. Lehmann & Assocs., Inc.*, 602 F. Supp. 2d at 150 (citing *United States v. Rannells*, 175 IBLA 363, 380 (2008)); *Reoforce, Inc. v. United States*, 119 Fed. Cl. 1, 7-8 (2013).

---

[6] Prior to validity proceedings, unpatented claims amount to a potential property interest, since it is the discovery of a valuable mineral deposit and satisfaction of statutory and regulatory requirements that bestows possessory rights. *See Ickes v. Underwood*, 141 F.2d 546, 548–49 (D.C. Cir. 1944) (until there has been a determination that there has been a valuable discovery, claimants had only a gratuity from the United States); *Payne v. United States*, 31 Fed. Cl. 709, 711 (1994) (rejecting plaintiff's argument that in the absence of a challenge to validity, the court must take at face value their assertion that claims are supported by an adequate mineral discovery). To have a compensable interest in an unpatented mining claim sufficient to bring a taking action, the validity of the mining claim must be established. *See Ford v. United States*, 101 Fed. Cl 234, 238 (2011) (finding that without BLM determination, plaintiff could not establish a valid property interest in his unpatented mining claim).

### B.        Administrative Hearings

The instant dispute stems from the plaintiff's original 161 unpatented mining claims, located by his predecessors-in-interest between 1940 and the early 1970s, on approximately 4,968 acres of Federal land administered by BLM and the United States Forest Service ("USFS"), mostly found in the Siskiyou National Forest in southern Oregon.[7] *Freeman*, 179 IBLA at 342–43 & n.1; AR 5806.  Litigation over the validity of the plaintiff's claims has been ongoing for over two decades before the United States Court of Federal Claims, in DOI administrative proceedings, and before this Court.  *See Freeman*, 37 F. Supp. 3d at 322.

On September 9, 1992, the plaintiff filed an application seeking to patent 151 of the 161 mining claims.  *Freeman*, 179 IBLA at 343; AR 5806.  Before the application was acted on by BLM, a congressional moratorium took effect on October 1, 1994, halting the processing of patent applications for unpatented mining claims.  *See* Department of the Interior and Related Agencies Appropriations Act of 1995 § 112.  Due to this moratorium, BLM has not processed the plaintiff's application.  *Freeman*, 179 IBLA at 343; AR 5806.  On December 17, 1992, the plaintiff filed a "plan of operations" ("POO") with the USFS, proposing to sample and mine his claims, which was ultimately denied in October 2000.  *Id.*  On January 22, 2001, the plaintiff filed suit in the Court of Federal Claims, alleging that the United States had, "by refusing to approve his patent application and by effectively denying approval of his POO, engaged in a taking of his property rights," in violation of the Fifth Amendment.  *Freeman*, 37 F. Supp. 3d at 323; *see also* AR 10699–712 (Court of Federal Claims Complaint).  The plaintiff's claim before the Court of Federal Claims turns on whether he possesses a compensable property right against the United States.  To facilitate this determination, on October 10, 2001, the Court of Federal

---

[7] During the course of the contest proceedings, the plaintiff abandoned at least 79 of his claims, reducing the number of contested claims to 82.  *See Freeman*, 37 F. Supp. 3d at 322 n.9.

Claims stayed proceedings and remanded the matter to the DOI "for determination of the validity of plaintiff's mining claims." AR 10728 (Order at 1, *Freeman v. United States*, No. 01–0039 (Fed. Cl. Oct. 10, 2001)).  As of this Opinion, the Court of Federal Claims proceeding has been stayed for nearly fifteen years during the course of the administrative proceedings in this case.

To determine the validity of the plaintiff's mining claims, DOI retained Western Mine Engineering to produce two reports regarding the economic viability of the plaintiff's claims. The first report concerned the economic viability of the plaintiff's claim as of October 1994 (the date of the Congressional moratorium), while the second report concerned the economic viability of the plaintiff's claim as of October 2000 (the date of the rejection of plaintiff's POO).  *See Freeman*, 179 IBLA at 344; AR 5808.  In light of the reports, "BLM concluded that none of the [plaintiff's] claims contained minerals of sufficient quality or quantity to constitute a discovery, that the minerals could not have been marketed at a profit, and that the land embraced by such claims was nonmineral in character."  *Id.*  As a result, BLM issued a contest complaint challenging the validity of the plaintiff's claims.  *Id.*

The ALJ presided over contest proceedings spanning 25 days, 400 exhibits, and 3,400 pages of transcript.  *Freeman*, 179 IBLA at 342, 345; AR 5806, AR 5809.  As noted, the ALJ issued a detailed 88-page opinion, concluding that the plaintiff "failed to establish that a discovery of a valuable mineral deposit" by either the October 1994 or October 2000 marketability dates.  *See* ALJ Decision at 88, AR 2002.  The IBLA affirmed the ALJ Decision on August 11, 2010.  *See Freeman*, 179 IBLA 341.

## C.    Current Proceedings

The plaintiff filed suit in this Court to overturn the decision of the IBLA affirming the ALJ's finding of a lack of discovery.  Previously, this Court found that the IBLA properly

maintained jurisdiction over the plaintiff's contest proceedings. [8] *See Freeman*, 37 F. Supp. 3d 313.  The plaintiff's remaining cause of action alleges that the "IBLA's 2010 decision[,] declaring Plaintiff's mining claims invalid for lack of discovery of a valuable mineral deposit," *Compl.* ¶ 43, is "arbitrary and capricious," *id.* ¶ 44, contrary to the plaintiff's constitutional rights, *id.* ¶ 45, in excess of statutory authority, *id.* ¶ 46, "issued without observance" of procedural requirements under the APA, *id.* ¶ 47, and unsupported by substantial evidence, *id.* ¶ 48.  The plaintiff's pending partial motion for summary judgment addresses only his remaining cause of action—the plaintiff's APA challenge to the merits of the 2010 IBLA Decision.

## II.     LEGAL STANDARD

### A.     Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based upon the pleadings, depositions, and affidavits and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v. Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am.*

---

[8] Although the plaintiff originally agreed with the BLM that validity should be determined as of October 1994 and October 2000 and that the ALJ had jurisdiction to make such a determination, in an abrupt "about face" the plaintiff subsequently challenged the jurisdiction of the ALJ and IBLA to determine validity as of those historical dates.  *See Freeman*, 37 F. Supp. 3d at 326 n.12.

*Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).

Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally

speaking, district courts reviewing agency action under the APA's arbitrary and capricious

standard do not resolve factual issues, but operate instead as appellate courts resolving legal

questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).

Judicial review is limited to the administrative record, since it "is black-letter administrative law

that in an [Administrative Procedure Act] case, a reviewing court should have before it neither

more nor less information that did the agency when it made its decision." *CTS Corp. v. EPA*,

759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted; alteration in

original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it

cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (in applying

the arbitrary and capricious standard under the APA, "[t]he focal point for judicial review should

be the administrative record already in existence . . . ." (quoting *Camp v. Pitts,* 411 U.S. 138, 142

(1973)).

## B.  Administrative Procedure Act

Under the APA, a reviewing court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of

procedure required by law," *id.* § 706(2)(D); *see Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d

116, 120–21 (D.C. Cir. 2014) (citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C.

Cir. 2004)).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must

consider whether the [agency's] decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *Marsh v. Ore. Natural Res. Council,* 490 U.S. 360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013).  The scope of review under this standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Fogo De Chao,  Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same) (quoting *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011)); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013) (same) (quoting *Cablevision Sys. Corp. v. FCC,* 597 F.3d 1306, 1311 (D.C. Cir. 2010)).

"[T]he arbitrary and capricious standard is 'highly deferential' and 'presumes agency action to be valid[.]'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,* 724 F.3d 243, 245 (D.C. Cir. 2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008)); *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981) (same).  If an agency, however, "failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) ("[T]here are cases where an agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring that we can declare with confidence that the agency action was arbitrary and capricious." (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994)) (alteration in original).  At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts

found and the choice made." *State Farm,* 463 U.S. at 43 (internal quotation marks and citation

omitted); EPA v. *EME Homer City Generation L.P.*, 134 S. Ct. 1584, 1602 (2014) (holding that

agency "retained discretion to alter its course [under a regulation] provided it gave a reasonable

explanation for doing so"); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir.

2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons

for decision; an agency's failure to do so constitutes arbitrary and capricious agency action."

(internal quotation marks and citation omitted)).  "[C]onclusory statements will not do; an

agency's statement must be one of *reasoning*."  *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal

quotation marks omitted; emphasis in original).

The D.C. Circuit has provided explicit instructions on the scope of review under the

arbitrary and capricious standard applicable to challenges, such as the instant one, to a decision

of the IBLA regarding mining claims. *See Aera Energy LLC v. Salazar*, 642 F.3d 212, 218 (D.C.

Cir. 2011) ("[T]he IBLA's decision . . . represents Interior's final agency action for the purposes

of judicial review"). Specifically, in *Orion Reserves*, 553 F.3d at 703–04, the Court stated: "We

uphold the IBLA's determinations so long as the Board engaged in reasoned decisionmaking and

its decision is adequately explained and supported by the record. Likewise, because substantial

evidence means such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion, we reverse an agency's decision only when the record is so compelling that no

reasonable factfinder could fail to find to the contrary." *Id.* (internal citations and quotation

marks omitted).

## III.  DISCUSSION

To satisfy the discovery requirement for a valid claim, the mere physical presence of a

mineral is insufficient. Instead, "the discovered deposits must be of such a character that a person

of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *United States v. Coleman,* 390 U.S. 599, 602  (1968) (internal quotations omitted); *see also Cameron,* 252 U.S. at 459, ("[T]o support a mining location the discovery should be such as would justify a person of ordinary prudence in the further expenditure of his time and means in an effort to develop a paying mine. That is not a novel or mistaken test, but is one which the Land Department long has applied and this court has approved."); *Davis v. Nelson,* 329 F.2d 840, 846 (9th Cir. 1964) ("[V]alidity of [ ] title . . . depends upon the resolution of a question of fact, that is, has there been a discovery of valuable mineral within the limits of the claim?"); *Foster v. Seaton,* 271 F.2d 836, 838 (D.C. Cir. 1959).  In applying this "prudent man test," "profitability is an important consideration . . . ." *Coleman*, 490 U.S. at 602.  "Minerals which no prudent man will extract because there is no demand for them at a price higher than the costs of extraction and transportation are hardly economically valuable" and will not establish the discovery requirement of a valid claim.  *Id.*

Following a lengthy contest claim hearing, involving testimony from numerous experts and the admission of over 400 exhibits, the ALJ issued a detailed ruling explaining that the plaintiff had failed to make a valid discovery on his claim.  *Freeman*, 179 IBLA at 342, 345; AR 5806, AR 5809.  In assessing the evidence presented, the ALJ determined that the "Government's witnesses are generally much better qualified than [the plaintiff] and his witnesses and hence the Government's estimates are generally more credible."  ALJ Decision at 66; AR 1980.[9]  The ALJ determined that the BLM established a *prima facie* case that the plaintiff had not found "minerals of such quality and quantity" to establish a valid discovery.

---

[9] Where the ALJ's credibility determinations are adopted by the agency upon appeal, "the court will not reverse . . . an administrative law judge's credibility determination unless it is 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'"  *Hard Rock Holdings, LLC v. NLRB*, 672 F.3d 1117, 1121 (D.C. Cir. 2012) (quoting *United Food & Commercial Workers Union Local 204 v. NLRB*, 447 F.3d 821, 824 (D.C. Cir. 2006)).

ALJ Decision at 20; AR 1934.  The BLM analysis established that "operating costs alone would have exceeded revenues from mining . . . by an estimated $89,454,079 in October 2000 and $63,460,737 in October 1994." *Id.* at 21; AR 1935.  In short, the plaintiff "would lose money on each tone of ore mined, without consideration of the substantial capital costs." *Id.*

The ALJ also concluded that the plaintiff failed to overcome the BLM's prima facie case. The ALJ concluded that the plaintiff relied on "unproven, untested, and unconventional technologies" and relied on known technologies to "consistently function at their outermost limits." ALJ Decision at 61, AR 1975.  As a result of the numerous obstacles faced by the plaintiff, the ALJ did not even "reach the issue of capital costs," which would have further undermined the profitability of the plaintiff's proposal. *See Freeman*, 179 IBLA at 351; AR 5815.  The IBLA reviewed the case "de novo" and found "no reason to disturb [the ALJ's] findings or result." *Id.* at 388; AR 5852.  The IBLA concluded that to upset the ALJ determination "would be to construct a case that leaps well beyond the facts established in the hearing and contrary to the applicable law." *Id.*

The plaintiff now seeks to overturn the IBLA decision, leveling a scattershot of complaints against the analysis performed by the Board.[10]  In doing so, the plaintiff merely urges

---

[10] The plaintiff also faults the Federal Defendants for leveling "ad-hominin attacks" in their briefs by noting that:

> The ALJ found that "the record does not indicate that Freeman has had any practical experience managing a smelter or that he has ever worked in a smelter." AR01985-86. Freeman has never been involved in the commercial production of ferronickel or his alleged "master alloy." AR04637-38. Freeman has never produced material from a nickel laterite deposit on a commercial scale. AR04638. He holds no professional licenses relevant to the expertise he asserts in this case. AR04696. Freeman spoke at the hearing about his experience working for IDC as if Freeman's experience is representative of IDC's exploration of the claims. AR06214. The reality is that IDC's lead geologist, Boies Hall, fired Freeman after Freeman had worked four to five months on the job. AR04744. Mr. Hall reported that "unethical actions prompted Freeman's termination and an immediate stoppage of the sampling program on November 8, 1974." AR09327; AR04777.

Fed. Defs' Mem. Supp. Cross-Mot. Summ J. at 14, ECF No. 27.  Notably, the plaintiff does not dispute the veracity of the assertions.

an alternative view of competing testimony and repeats arguments carefully considered and
rejected by the IBLA in assessing the validity of the plaintiff's claim.  Such argument is
inappropriate in this Court and cannot not sustain his motion for summary judgment.  The D.C.
Circuit is clear:  An IBLA decision will be reversed "only when the record is so compelling that
no reasonable factfinder could fail to find to the contrary."  *Orion Reserves*, 553 F.3d at 703–04.
The plaintiff's arguments fall far short of this high standard.  The IBLA engaged in reasoned
decision making that was fully explained and adequately supported by the record.  *See id.*  The
IBLA's decision will not be disturbed.

A.      **The IBLA Reasonably Analyzed the Relevant Price of Nickel for Assessing
        Economic Viability**

The plaintiff's chief complaint concerns the price data used to assess the economic
viability of his claim at the time of the alleged government taking.  The issue before the IBLA
was whether the plaintiff established a valid claim at either the time of the Congressional patent
moratorium (October 1994) or at the time of BLM's denial of the plaintiff's POO (October
2000)—the dates of the alleged government taking.  During the BLM's mineral examination and
during the subsequent contest proceedings, the Government's experts applied the BLM's Mineral
Commodity Price Policy ("MCP") as of those dates to reach their conclusions regarding the non-
viability of the plaintiff's claim.  The MCP employs a six-year pricing average, examining
pricing data for the thirty-six months preceding the marketability date, the average price in the
month of the marketability date, and the average futures prices in each of the thirty-six months
following the marketability date.  *See* 65 Fed. Reg. 41,724.  In other words, the MCP looks both
backwards and forwards to estimate a reasonable nickel price.  Under the MCP, the nickel price
was $2.93 per pound as of October 2000 and $3.00 per pound as of October 1994. In 2007, at the
time of the contest proceedings before the ALJ, the price of nickel had surged to a historic high

of $21.00 per pound.  *See Freeman*, 179 IBLA at 354–55; AR 5818–819.  Accordingly, the

expected price of nickel as of the alleged government taking was of central importance to the

viability of the plaintiff's proposed mine.

After listening to testimony and examining the forecasts of industry analysts, the ALJ

concluded that the plaintiff had not submitted evidence justifying a price different than the price

established by the MCP, and that the plaintiff had failed to make "the necessary showing that . . .

higher prices could have been reasonably anticipated."  ALJ Decision at 27, AR 01941.  The

IBLA's "review of the evidence regarding nickel price predictions confirm[ed] [the ALJ's]

conclusion that the weight of the evidence on the topic of nickel prices in the relevant 6-year

period [did] not support a nickel price above $4.00 a pound."  *Freeman*, 79 IBLA at 357;

AR 5821.

Nonetheless, the plaintiff challenges the application of the MCP in the present case,

arguing that it is a non-binding policy rather than a substantive rule of law, does not apply by its

very terms (or, if it does apply, requires the use of nickel prices as of the 2007 contest

proceeding), conflicts with the prudent person standard, and that historical pricing should have

been used.  *See* Pl.'s Mem. at 13–34.  In making these arguments, the plaintiff merely

regurgitates arguments previously made and rejected by this Court in his jurisdictional challenge.

*See Freeman*, 37 F. Supp. 3d at 334–336.  In his jurisdictional challenge, the plaintiff argued that

the policy of the DOI, as embodied by the MCP, was to determine the validity of a mining claim

as of the date of the contest proceeding and not any prior historical period.  *Id.* at 334.  The Court

rejected the plaintiff's argument, noting that the MCP was not binding upon the IBLA and that,

even if it were, the MCP permitted validity to be determined as of historical dates and not just as

of the contest proceeding.  *Id.* at 334–336.  Whereas the plaintiff's prior challenge concerned the

proper dates by which validity was to be determined, the plaintiff's present challenge concerns the price range to be used in order to determine validity.  Now, like before, the plaintiff argues that the MCP requires that the expected price of nickel as of the contest proceeding be considered rather than the expected price of nickel as of any historical date.  For the same reasons provided in the prior opinion, the plaintiff's argument is rejected.  *See id.* at 334–336.

In addition, contrary to the arguments of the plaintiff, the application of the MCP in this case does not conflict with the prudent-person standard.  *See* Pl.'s Mem. at 20 ("The prudent person test cannot be squeezed into a narrow formula as the Interior Department's Pricing Policy purports to do.").  The ALJ recognized that the MCP was non-binding, but concluded that "the Government's use of the six-year average policy was appropriate and resulted in estimated prices that a person of ordinary prudence would have relied on in determining whether to develop the [plaintiff's] claims in October 1994 and October 2000."  ALJ Decision at 30; AR 1944. Similarly, the IBLA determined that it was reasonable for the ALJ to apply the MCP in the present case and that there existed substantial evidence in the record to support the price established by the MCP.  *See Freeman*, 179 IBLA at 356; AR 5820 (discussing "nickel price predictions" of numerous analysts consistent with the price range established by the MCP).  As a result, the IBLA upheld the ALJ's determination that "the weight of the evidence on the topic of nickel prices . . . does not support a nickel price above $4.00 a pound."  *Id.* at 357; AR 5821. Thus, the IBLA did not substitute the MCP in place of the prudent-person standard, but instead determined that the expected price of nickel resulting from the MCP was consistent with the price a prudent person would use in evaluating whether to proceed with the development of a claim.

In rejecting the plaintiff's claim that historical prices should have been used, the IBLA reasoned that "a prudent person would not decide whether to expend time and money to develop a paying mine based on the possibility of a record nickel market bubble in the future." *Id.* Indeed, as the plaintiff's own witness testified before the ALJ, nickel prices at the time of the hearing were "way higher than anyone would have even dreamed of . . . ." AR 4123. Another witness for the plaintiff had forecast in 1998 that nickel prices through 2010 would range from "an average low of $3.32 per pound, an average medium price of $3.52, and an average high of $3.96 per pound." *Freeman*, 179 IBLA at 356 n.12; AR 5820. The record evinces clear support for expected nickel prices in the range used by the ALJ and the IBLA.[11]

The IBLA further rejected the plaintiff's argument—also advanced here—that the historical prices of nickel "prove[] that a person who chose to develop the claims in 1994 or 2000 'would have obviously been prudent.'" *Freeman*, 179 IBLA at 355; AR 5819. The question is not whether the development of the mine would have subsequently been profitable given record nickel prices, but whether a prudent person would have developed the mine with the information available at that time.[12] *See Coleman*, 490 U.S. at 602. The ALJ and the IBLA both examined past market prices, futures prices, and the estimates of numerous analysts to determine

---

[11] The plaintiff also argues that a prudent person would be able to predict a global shift in nickel prices resulting from an increase demand from China. *See* Pl.'s Mem. at 19. As noted, the record shows that industry analysts took a different view of price projections. The record also shows that increases in worldwide output were expected to keep pace with increased demand. *See* AR 10503 (noting the "risks for nickel prices are firmly on the downside if a significant portion of the nickel capacity currently under construction manages to obtain finance and start production . . . .").

[12] In this regard, the plaintiff's reliance on *Andrus v. Shell Oil Co.*, 446 U.S. 657 (1980) is misplaced. Although *Andrus* permitted patents to shale oil deposits that were not otherwise profitable at the time of location, *Andrus* was expressly limited to shale oil deposits. *See id.* at 673 n.11 ("This history indicates only that a present marketability standard does not apply to oil shale. It does not affect our conclusion in *United States v. Coleman* that for other minerals the Interior Department's profitability test is a permissible interpretation of the 'valuable mineral' requirement."). The plaintiff also notes that in *Lara v. Secretary of the Interior*, the Ninth Circuit did not require a showing of profitability for precious metals. *See* 820 F.2d 1535, 1541 (9th Cir. 1987). To the extent the plaintiff argues that *Coleman's* prudent-person standard should be limited to "common industrial minerals" and not apply to claims for nickel, which is a "base metal," this Court is unpersuaded that the distinction between base metals and common industrial minerals warrants a change in the standard.

the expected price of nickel that a prudent person would use in evaluating the prospects for his

claim.  The IBLA's determination was reasoned, supported by the evidence, and not arbitrary or

capricious.  The plaintiff's challenge to the nickel price used by the IBLA fails.

### B.      The IBLA Reasonably Assessed the Viability of Upgrading the Ore and Using a Master Alloy.

The plaintiff proposed alternative methods for utilizing his ore in order to establish the

viability of his claim.  The plaintiff proposed to "upgrade" the ore, *see* Pl.'s Mem. at 35–39, and

to make a "master alloy" or "nickel-iron-chrome alloy" from the ore, *see* Pl.'s Mem. at 40–61.

The IBLA's rejection of the viability of both proposals was reasonable and considered.

The IBLA upheld the ALJ's conclusion that it was "not possible to upgrade the ore" after

explicitly examining the testimony from two of BLM's mineral examiners.[13]  Both examiners

examined data originally obtained by IDC and concluded "that it was not possible to upgrade the

nickel." *Freeman*, 179 IBLA at 385–86; AR 5849–50.  The IBLA examined both the original

mining data, *see id.* ("Indeed, of the data for six sites shown on Ex. 148, Plate 12, two were not

usable.  Two of the four usable data actually decreased the grade of the nickel, while the other

two showed an increase of five-hundredths of one percent."), and the expert testimony presented

---

[13] The plaintiff argues that he is entitled to a "trial *de novo*," under 5 U.S.C. § 706(2)(F) regarding the potential for upgrading the ore because the IBLA decision referenced the "opinion" of former IDC employee Boise Hall, even though Mr. Hall did not testify, was not an expert witness, and could not be compelled to testify since he was not subject to the subpoena power of the agency.  *See* Pl.'s Mem. at 36.  Contrary to the plaintiff's allegations, the IBLA decision did not "specifically rel[y]" on the opinion of Mr. Hall.  *Id.*  Rather, the IBLA simply noted that "[p]art of the Government's information was provided by Boies Hall, who had performed 50 of the IDC's tests, and he was likewise of the opinion that one could not expect to upgrade the ore . . . ."  *Freeman*, 179 IBLA at 386; AR 5850.  Moreover, "before a court proceeding under the APA can substitute *de novo* review for review of the agency's record," the agency's "procedures must be *severely defective.*"  *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 745 (D.C. Cir. 1984) (emphasis added) (discussing *Citizens of Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)); *see also Zevallos v. Obama*, 10 F. Supp. 3d 111, 118 n.2 (D.D.C. 2014) ("This is not an extraordinary case where no fact-finding procedures at all were used—on the contrary, OFAC has submitted a lengthy administrative record showing the relevant facts it has collected over the years . . . and upon which it relied in reaching its decision.").  The plaintiff has not alleged a substantial defect in the agency's process so as to warrant a *de novo* review in this Court.  Indeed, even if this Court were to conduct a *de novo* trial as the plaintiff suggests, the subpoena power of this Court is also limited and might not be sufficient to compel the testimony of Mr. Hall.  *See* Fed. R. Civ. P. 45(c).

at the hearing, *see id.* ("In addition, Krasowski and Schumacher shared the opinion that there was no greater nickel value in the rinds of boulders than the surrounding environment."). The IBLA's decision was consistent with the evidence presented and entirely reasonable.

The IBLA's rejection of the plaintiff's proposed master alloy was likewise reasonable.[14] To make the plaintiff's proposed master alloy, the plaintiff's claim would need to contain a sufficiently large chromium resource. The plaintiff argues that while "there is testimony that the extent of chromium is uncertain, . . . there is not substantial evidence in the whole record that a prudent person must conclude that there is no chromium in the claim that can be recovered by mining." *See* Pl.'s Mem. At 45–46. Once again, the plaintiff misstates the prudent person inquiry and the IBLA's conclusions in this case. The record amply reflects the existence of significant uncertainties regarding the presence and extent of any chromium resource in the plaintiff's claim, as the plaintiff acknowledges. *See id.*; *see also Freeman*, 179 IBLA at 363–64; AR 5827–28 (discussing uncertainties regarding presence and quantity of chromium resource). In light of this uncertainty, and the costs associated with extracting the uncertain resource, the question becomes whether a prudent person "would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine," not whether a prudent person *must* conclude that no chromium can be recovered. *Coleman,* 390 U.S. at 602.

Second, and fatally to the plaintiff's argument, neither the ALJ nor the IBLA relied on the uncertain presence of chromium in order to reach their conclusion regarding the viability of the plaintiff's master alloy. *See Freeman*, 179 IBLA at 364; AR 5828 ("The foregoing provides a sufficient basis for rejecting [the plaintiff's] assertions with respect to the alleged chromium

---

[14] The process by which the plaintiff makes his master alloy "later became known as the Direct Alloy Reduction Technology or DART." Pl.'s Mem. at 1.

resource, but it is not necessary to go further with the issue because [the ALJ] assumed *arguendo* that [the plaintiff] had demonstrated the presence of chrome on the Nicore claims, and in the quantities he asserts, and nonetheless concluded that he had failed to show a discovery . . . .”). Instead, both decisions examined the proposed costs and methods associated with the extraction of the ore in order to make both ferronickel and the plaintiff’s master alloy.  Following careful consideration of the proposed costs and the amount of chromium (if any) that could be extracted, the IBLA concluded that the plaintiff’s claim was not viable under either theory.

### C.      The IBLA Reasonably Calculated the Costs in Extracting the Ore

The plaintiff also attacks the estimated production costs employed by the IBLA in reaching its decision.  Specifically, the plaintiff targets the IBLA’s examination of electrical costs, *see Pl.’s Mem.* at 61, the IBLA’s treatment of the plaintiff’s proposed cost saving measures, *id.* at 62, and the IBLA’s estimates regarding the costs of using lime in the smelting process, *id.* at 41–42.  In doing so, the plaintiff urges upon this Court the same arguments considered and rejected by both the IBLA and the ALJ.

To lower costs, the plaintiff proposed to use an interruptible power source for his operations.  The ALJ found, however, that the plaintiff “had failed to demonstrate that it would be cost-effective to purchase interruptible power.”  *Freeman*, 179 IBLA at 374; AR 5838.  On appeal before the IBLA, and now before this Court, the plaintiff argues that the ALJ and now the IBLA ignored the plaintiff’s evidence that the power would only be interrupted in the winter months and improperly required the plaintiff to conduct a cost-benefit analysis regarding the use of interruptible power.  Neither contention withstands the most cursory scrutiny.  The IBLA decision expressly considered the plaintiff’s argument that the risks of interruptible power were reduced because they were “weather-related predictable events that occur only once a year.”  *Id.* at 375; AR 5839.  Nonetheless, the IBLA noted that the plaintiff failed to account for a series of

risks that might raise the costs of an interruptible power source, including "the cost for a back-up generator" since interruptions might occur unexpectedly and for more than a "short duration." *Id.* at 374; AR 5838.  Ultimately, the ALJ concluded, and the IBLA affirmed, that "there are risks, and costs associated with such risks," that were not fully considered by the plaintiff in proposing the use of an interruptible power source and that these risks could "directly affect [the] safety and productivity" of the mine.  *Id.* at 375; AR 5839.  As a result, both concluded that the plaintiff "failed to present appropriate analysis [demonstrating] that he could achieve the cost savings he projected by purchasing interruptible power." *Id.*  The IBLA's decision was reasoned, explained, and supported by the record.

The plaintiff also objects to the IBLA's rejection of two other proposed cost saving measures.[15]  Specifically, the plaintiff proposed to use "solar air drying" to dry the ore and to use local "wood waste" as part of the smelting process.[16]  Pl.'s Mem. at 62–63.  The plaintiff argues that "a reasonably prudent person would seek to take advantage of climatic conditions to pre-dry the ore before it went into the kiln."[17]  *Id.*  The plaintiff claims that because solar air drying has

---

[15] Although the plaintiff appears to withdraw these arguments in his reply brief, the Court will consider them in the interests of completeness.  *See* Pl.'s Reply at 25 ("While [the plaintiff] still believes [it makes sense to use solar power to remove some of the moisture out of the ore] from an environmental perspective, this is not an argument that [the plaintiff] has made for reversal of the IBLA's decision."); *id.* ("While [the plaintiff] still believes that [the use of wood waste to fuel the kiln] is an environmentally responsible method of operating a kiln, . . . [the plaintiff] can accept the Government's argument that he must use oil or coal to fuel his kiln.").

[16] Ordinarily, "[n]ickel laterite smelters dry ore in a dryer before feeding it to the calciner kiln."  *Freeman*, 179 IBLA at 365; AR 5829.

[17] The IBLA summarized the plaintiff's testimony regarding his proposed solar drying scheme as follows:

> Freeman testified that a May 2003 sample stored in a BLM shed in Medford, Oregon, had 2 percent free moisture by the time it was shipped to the Albany Research Center, U.S. Bureau of Mines, Department of the Interior, and, based on that phenomenon, he "believes" he can reliably and predictably achieve a 20 percent free moisture content by air drying, which would reduce fuel oil consumption from the 143 pounds Bergman estimated to 112 pounds. . . . . Freeman recalled that the tin storage shed was probably "pretty warm in there" and that the 2000-pound sample was stored "over the summer," . . . . He testified that he would require an area to lay the material out to dry in a "pretty thin" layer using the plant's front-end feeder loader, the material would be raked up and turned on a daily basis and, after "a few days," it would be stored in a facility or under a tarp. . .  He did not otherwise identify or explain what he would or could do to ensure that he

successfully been used in Australia, a similar process could be used in Oregon.[18]  The IBLA

considered the plaintiff's proposal and rejected it, noting that the plaintiff did not provide

"adequate support" for his theory or estimate the costs associated with his solar air drying

scheme.  *See Freeman*, 179 IBLA at 367; AR 5831 ("Nor do we find adequate support for [the

plaintiff's] assumption that he can dry the material to 20 percent moisture content in 6 days

based on the moisture content of the ton of laterite material that was stored in a warm tin shed for

a summer . . . .").  Indeed, the plaintiff did not identify "places where air drying might take

place," 179 IBLA at 365; AR 05829, and expert testimony concluded that the results to be

obtained from any solar air drying are "very marginal."  *Id.* at 366; AR 05830.  Additionally, the

IBLA concluded that the plaintiff's "plan to use the plant loader to turn the laterite material [was]

not well-founded."  *Id.* at 366; AR 5830.  The IBLA's rejection of the plaintiff's proposed cost

savings was fully supported by the record and adequately explained in its opinion.

    The IBLA also found that the plaintiff's proposal to use "biomass" and "wood waste" as

kiln fuel was too speculative to justify a person of ordinary prudence from relying upon such a

process.  *See Freeman*, 179 IBLA at 373; AR 5837.  As an initial matter, "no smelter [in the

world] uses only wood waste as kiln fuel."  *Id.* at 371; AR 5835.  The plaintiff's own witness in

support of the technique testified that he was uncertain whether it would be possible to heat a

wood-fired kiln to a sufficient temperature to ensure proper calcining of the ore.  *See id.* at 372;

AR 5836 ("Do you know if using wood chips would achieve the correct temperature of a nickel

laterite calciner?  A: I don't know.").  Moreover, the risks, which include "flames literally

---

consistently achieved the 20 percent moisture content for more than 54 tons of material or the
costs associated with that activity.

79 IBLA at 365; AR 5829.

[18]  The plaintiff does not address the potential for rainfall in Oregon during the proposed period of solar air drying.

bursting from the kiln," further suggest the need for caution. *See Freeman*, 179 IBLA at 369–73; AR 5833–37 (discussing testimony describing proposed process as creating "a significant matter of safety").  The IBLA's finding that a person of ordinary prudence would not rely upon such a process was adequately supported by the record.

Finally, the IBLA concluded that the plaintiff had not evidenced cost savings from his proposed use of lime or "adequately estimated the cost of calcining local limestone to produce the necessary flux." *Freeman*, 179 IBLA at 378; AR 5842.  In order for the plaintiff to make his proposed master alloy, the plaintiff would need to use lime as part of the smelting process.[19]  The plaintiff disputes how much lime would be required, and the cost to source it.  Both the ALJ and the IBLA sided with the DOI and concluded that 500 pounds of flux was a more reasonable estimate of the amount of lime required than the plaintiff's estimate of 146 pounds.  *See Freeman*, 179 IBLA at 377; AR 5841 ("Viewed as a whole, the record clearly shows that 500 pounds of flux is more realistic than 146 pounds . . . ."); ALJ Decision at 64; AR 1978 ("Based on Mr. Bergman's expertise and his credibility, it is reasonable to model processing costs for [the plaintiff's] smelting facility using 500 pounds of flux per ton of calcine rather than [the plaintiff's] proposed 146 pounds of flux per ton of calcine.").  In reaching this determination, both the ALJ and the IBLA reviewed the relevant testimony and examined the underlying tests.  Nonetheless, the plaintiff disputes the IBLA's alleged reliance on the testimony of one of the Federal Defendants' expert witnesses, Mr. Bergman.[20]  The ALJ found, however, that Mr.

---

[19] "Lime is a flux, an ingredient added in the smelting process to maintain the slag in a molten state by reducing its melting point to just above the melting point of the metal so that the heavier metal reports to the bottom of the furnace and the slag remains on top." *Freeman*, 179 IBLA at 376; AR 5840.

[20]  The plaintiff describes the IBLA's reliance upon the testimony of Mr. Bergman as the IBLA's "most egregious 'error.'" Pl.'s Mem. at 11.  As a result, the plaintiff also requests a *de novo* trial regarding the amount of lime necessary because of the alleged unfairness regarding the testimony of Mr. Bergman.  *See* Pl.'s Mem. at 36–37. According to the plaintiff, prior to trial, Mr. Bergman revised his estimates regarding the estimated costs of the plaintiff's proposed mine, used a "proprietary" software program to make his calculations, and failed to maintain spreadsheets that formed the basis of his calculations.  *Id.*  As discussed above, *see supra* note 13, the plaintiff must

Bergman "is exceptionally well-qualified to address this subject and is much better qualified than any witness presented by [the plaintiff]." ALJ Decision at 22; AR 1936.  Moreover, the IBLA did not rely solely upon the testimony of Mr. Bergman but also upon the underlying research data regarding the amount of lime necessary.  *See Freeman*, 179 IBLA at 378; AR 5842 ("The critical point is that none of [the plaintiff's] allegations on appeal changes the batch test results at Albany Research Center . . . .").  The IBLA's examination of the costs associated with the necessary lime was considered and reasoned.

### D.    The Plaintiff's Remaining Arguments Likewise Fail

The plaintiff also finds fault with the IBLA because the ALJ referred "to some costs in terms of dollars per calcine and others in per ton of dry ore."  Pl.'s Mem. at 64.  The IBLA considered this issue, noting that the ALJ "used the terms as if they were synonymous," and that the parties did not "misunderstand his intended context or usage."  *Freeman*, 179 IBLA at 354; AR 5818.  Nonetheless, the IBLA conducted a *de novo* review of the record and reached the same conclusion as the ALJ regarding the validity of the plaintiff's claim.  Accordingly, the plaintiff's argument the IBLA decision should be reversed because of a linguistic error by the ALJ is rejected.

In addition, the plaintiff challenges the conclusion of the IBLA opinion, which noted that many of the assumptions underlying the plaintiff's proposal are open to question.[21]  In doing so,

---

identify a substantial defect in the administrative process to justify *de novo* review in this Court.  It is unclear how the plaintiff's allegations amount to a procedural defect as opposed to fodder for the plaintiff's cross-examination of Mr. Bergman.  Indeed, cross examination is "'the greatest legal engine ever invented for the discovery of truth.'" *Lilly v. Virginia*, 527 U.S. 116, 124 (1999) (quoting *California v. Green*, 399 U.S. 149, 158 (1970).  In any event, the plaintiff has not come close to meeting his burden to justify a *de novo* trial.

[21] *See Freeman*, 79 IBLA at 388; AR 5852 (noting that many of the plaintiff's assumptions "are subject to question, not supported in, or are contradicted by the hearing record" including: "(1) the Nicore Group claims have similar values; (2) the claims were adequately and properly sampled by IDC; (3) the claims contain a chromium resource; (4) a master alloy can be produced; (5) only 630 pounds of wood waste are required to produce the required carbon per ton of ore; (6) [the plaintiff's] operation would require 650 kWh; (7) electricity costs $.032/kWh; (8) [the plaintiff] could have contracted with an IPP for interruptible power in 2000; (9) only 323 pounds of lime as a reductant was adequate; (10) certain additional costs identified by [the plaintiff] are valid; (11) the appropriate

the IBLA properly noted that the key inquiry in the case concerns the actions of the prudent person and whether a prudent person would be justified in the "further expenditure of his time and means in an effort to develop a paying mine." *Cameron,* 252 U.S. at 459.  It was not error for the IBLA to note the uncertainties regarding the plaintiff's proposal in evaluating the prudent person standard.  While the plaintiff might have a different view of the relative risks of each of these uncertainties, the IBLA acted reasonably in considering the uncertainties surrounding the plaintiff's claim.

*     *     *

In sum, the plaintiff's argument that an individual "*could be* prudent in efforts to develop a productive mine" at his claim is unavailing.  Pl.'s Mem. at 34 (emphasis added).  Repeatedly in the arguments made before the IBLA, and now this Court, the plaintiff strings together a series of untested assumptions and best-case scenarios to argue that his mining claim *could* work and that it would therefore be prudent to pursue.  The plaintiff's arguments reveal a profound misunderstanding of the prudent person standard.  A prudent person carefully balances the risks, and the costs associated with those risks, against the expected return.  Yet, in the instant case, the plaintiff ignores the costs associated with the risks inherent in his proposal.  The plaintiff's "analysis is based on unproved or undeveloped technology and requires existing technology to meet demands which may be theoretically possible but which exceed what a person of ordinary prudence would reasonably expect."  ALJ Decision at 46; AR 1960.  This is not surprising given the context here:  The plaintiff makes his development proposals against the backdrop of a takings proceeding where he seeks compensation for the alleged $146 million value of his claim as opposed to enduring the actual financial and physical risks of developing his proposed mine.

---

metals recovery rate is 97 percent; (12) [the plaintiff] can recover the amounts of nickel, iron, and chrome shown in Ex. F-296; and (13) the laterite ore can be upgraded.").

Nevertheless, the legal discovery of a valid mineral is not an exercise in the possible but in the prudent.  After reviewing the testimony and the evidence, both the ALJ and the IBLA issued detailed and thorough decisions, concluding that the plaintiff failed to make a discovery of a valid mineral right on his claims.  These decisions were imminently reasonable and will not be disturbed by this Court.

## IV.     CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Partial Summary Judgment, ECF No. 25, is denied and the Federal Defendants' Cross-Motion for Summary Judgment, ECF No. 27, is granted.  An appropriate Order accompanies this Memorandum Opinion.


Date:  March 17, 2015


_____
BERYL A. HOWELL
United States District Judge